# CIRCUIT COURT OF THE CITY OF NORFOLK

Scott C. Harvard

    v.

Shore Bank
and Hampton Roads
Bankshares, Inc.

November 21, 2014

Case No. (Civil) CL13-4525-00

By Judge Charles E. Poston

This action was tried to the Court on July 30, 2014, after which the Court took the matter under advisement pending receipt of written post-trial submissions of the parties. For the following reasons, the Court grants judgment to the Plaintiff and also awards the Plaintiff attorney's fees and costs from the federal action and the current action.

*Background*

This case arises from an employment contract dispute between the Plaintiff, Scott C. Harvard, and the Defendants, Shore Bank and Hampton Roads Bankshares, Inc. ("HRB"). Harvard alleges that HRB and Shore Bank failed to pay him his contracted severance allowance.

Harvard was the President of Shore Bank and Executive Vice President of Operations for HRB in Delaware, Maryland, and Virginia. Shore Bank is a corporation organized under Virginia law. In the mid-1990s, Shore Bank formed Shore Financial Corporation as a holding company. Harvard was also President and CEO of Shore Financial Corporation, but Shore Bank paid Harvard his salary from the payroll account at Shore Bank.

In 2008, Shore Bank became the wholly owned subsidiary of HRB. Shore Financial Corporation, in turn, merged with HRB. On January 8, 2008, HRB, Shore Bank, and Harvard entered into an employment agreement, under the terms of which Harvard was entitled to terminate his employment with the Bank within six months of a "change in control." According to

the agreement, a change in control occurs when "any one person, or more than one person, acting as a group, acquires ownership of stock of the Parent Company (HRB) possessing 30% or more of the total voting power of the stock." Upon termination, "[t]he Employer shall pay the Officer a severance allowance in sixty (60) equal monthly payments commencing on the last day of the month in which the Date of Termination occurs, the total amount of which will equal 2.99 times (2.99x) the base amount." Harvard's contracted annual base salary was $250,000. Additionally, Harvard was entitled to certain health and insurance benefits following his resignation.

In the wake of the financial crisis of 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA") which included the Troubled Asset Relief Program ("TARP"). Emergency Economic Stabilization Act, 12 U.S.C. 52 (2008). TARP granted the Secretary of the Treasury ("Secretary") the authority to "purchase and insure certain types of troubled assets" from financial institutions in order to provide liquidity to such institutions. *Id.* The EESA also gave the Secretary authority to set limits on executive compensation for the "senior executive officers" ("SEO") of financial institutions selling troubled assets to the Secretary. Emergency Economic Stabilization Act, Pub. L. No. 110-343, § 111, 122 Stat. 3776-77 (2008). Specifically, EESA gave the Secretary authority to prohibit a financial institution from making any "golden parachute payment to its senior executive officer during the period that the Secretary holds an equity or debt position in the financial institution." *Id.* at 3776-77(b)(2) (C). On October 20, 2008, the United States Department of the Treasury ("Treasury") issued an interim final rule ("October Rule") stating:

> a golden parachute payment means any payment in the nature of compensation to (or for the benefit of) an SEO made on account of an applicable severance from employment to the extent the aggregate present value of such payments equals or exceeds an amount equal to three times the SEO's base amount.

31 C.F.R. § 30.9 (2008) (internal quotations omitted).

On December 31, 2008, HRB entered into a Securities Purchase Agreement with Treasury and received TARP funds under the Capital Purchase Program ("CPP"). In conjunction with the Securities Purchase Agreement, Harvard, on the same date, signed a letter agreement with HRB establishing the specific standards for executive compensation while HRB participates in the CPP. In that letter, Harvard agreed that he could not receive any golden parachute payment during any CPP covered period. The letter agreement explained that the term "golden parachute is used with the same meaning as in Section 111(b)(2)(C) of EESA" and the October Rule, which limits compensation to three times the base amount. (Internal quotations omitted.) As of the date of the signing of the letter agreement, HRB, Shore Bank, and Harvard were in agreement that his total severance

compensation did not violate the October Rule because it was limited to 2.99 times his annual base amount. Nevertheless, under the terms of the letter agreement, Harvard agreed to a reduced severance package. Under the employment agreement, Harvard was entitled to 2.99 times his annual base amount, calculated as the annualized includible compensation for the preceding three taxable years. The October Rule defined the base amount as the average annualized includible compensation for services performed in the five years preceding the change in control. 26 C.F.R. § 1.280G-1 (2008). In order to comply with the federal regulations, Harvard also signed a document in which he waived "any claim against the United States or [his] employer for any changes to [his] compensation or benefits that are required to comply with the [October Rule]."

On December 31, 2008, the shareholders of Gateway Financial Services acquired 39% of HRB's outstanding voting shares. That purchase constituted a change in control as defined in Harvard's employment agreement. As of the date of the purchase, Harvard had six months to terminate his employment.

On February 17, 2009, Congress enacted the American Recovery and Reinvestment Act of 2009, amending the definition of golden parachute to mean "any payment to a senior executive officer for departure from a company for any reason, except for payments for services performed or benefits accrued." Pub. L. No. 111-5, § 7001, 123 Stat. 517 (2009). Treasury issued a more detailed interim final rule on June 15, 2009 ("June Rule"), which states:

> The term golden parachute payment means any payment for the departure from a TARP recipient for any reason, or any payment due to a change in control of the TARP recipient or any entity that is included in a group of entities treated as one TARP recipient, except for payments for services performed or benefits accrued.

31 C.F.R. § 30.1 (2009).

On June 24, 2009, Harvard terminated his employment as a result of the change in control event that occurred on December 31, 2008. The termination was within six months of the change in control event, as required by the Employment Agreement. As a result, Harvard requested payment of his contracted severance compensation. After consulting Treasury, HRB and Shore Bank, acting in reliance on the June Rule, refused to pay Harvard his contracted compensation.

Harvard subsequently filed this breach of contract action and alleged in Count I that HRB and Shore Bank are contractually obligated to pay him the compensation. He seeks damages of $750,000 plus interest. In Counts II through IV, Harvard alleged breach of contract for HRB and Shore Bank's failure to pay fees for previous breach of contract and declaratory judgment actions. In response, HRB and Shore Bank filed a Plea in Bar to Count I and

a Demurrer to Count II. The Court overruled the Demurrer by Order dated December 4, 2013. In support of their Plea in Bar, both HRB and Shore Bank argued that, as TARP fund recipients, they were legally prohibited from making any severance payment to Harvard in accord with Treasury's June Rule. Shore Bank asserted that it was a TARP recipient given its relationship to HRB. Conversely, Harvard argued that the American Recovery and Reinvestment Act, amending the EESA, and Treasury's subsequent June Rule, prohibiting payment of his contracted severance compensation, was a taking of his private property without just compensation in violation of the Fifth Amendment to the United States Constitution.

The Court denied the Defendants' Plea in Bar through a letter opinion dated April 30, 2014, [88 Va. Cir. 204] on the grounds that the amendment to the EESA and the subsequent June Rule directly targeted contract rights such as Harvard's and, therefore, the amendment constituted a taking for which just compensation was not provided. In reaching this conclusion, the Court relied on the Defendants' and Plaintiff's arguments and accepted certain factual arguments. Upon the Court's ruling on the Defendant's Plea in Bar, the Court held an *ore tenus* hearing and received evidence. Harvard and the Defendants submitted post-trial briefs. Shore Bank argues that Harvard was paid solely by Shore Financial Corporation during the period at issue. Harvard argues that Shore Bank is judicially estopped from asserting that Shore Bank and Shore Financial Corporation are separate entities that cannot be considered one employer for purposes of calculating the severance. He says Shore Bank asserted in its Plea in Bar that Shore Bank and Shore Financial Corporation were one employer under federal tax and TARP regulations.

## Discussion

### I. Judicial Estoppel Bars Defendants' Argument

"Judicial estoppel forbids parties from assuming successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory." *Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 325, 609 S.E.2d 49, 53-54 (2005) (citing *Lofton Ridge, L.L.C. v. Norfolk S. Ry.*, 268 Va. 377, 380-81, 601 S.E.2d 648, 640 (2004)). Judicial estoppel is an equitable doctrine that protects "the integrity of the judicial process." *Virginia Electric & Power Co. v. Norfolk S. Ry.*, 278 Va. 444, 462, 683 S.E.2d 517, 527 (2009) (citing *Parson v. Carroll*, 272 Va. 560, 564, 636 S.E.2d 452, 454 (2006)). Neither the Supreme Court of the United States nor the Supreme Court of Virginia established "inflexible requisites or an exhaustive formula" for determining when judicial estoppel applies, but they did create a list of prerequisite conditions. *Bentley Funding Group*, 269 Va. at 325-26, 609 S.E.2d at 55.

Three prerequisite conditions exist for the court to apply judicial estoppel. First, the inconsistent or contradictory assertions must be factual statements, not alternative legal theories or an erroneous position on a question of law. *Bentley Funding Group*, 269 Va. at 326, 609 S.E.2d at 54; *see also Lofton Ridge*, 268 Va. at 382, 601 S.E.2d at 651. Second, if the inconsistent positions occur in different proceedings, the parties must be the same. *Lofton Ridge*, 268 Va. at 382, 601 S.E.2d at 651. Finally, the court must have relied upon the prior inconsistent position when the court made its earlier decision. *Bentley Funding Group*, 269 Va. at 327, 609 S.E.2d at 55.

The third prerequisite can cause confusion in its application. The Virginia Supreme Court emphasized that the party whose assertions are the inconsistent positions "must have also persuaded the court to accept that earlier position." *Matthews v. Matthews*, 277 Va. 522, 529, 675 S.E.2d 157, 161 (2009). *Bentley Funding Group* stated the prerequisite in different language: "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Bentley Funding Group*, 269 Va. at 327, 609 S.E.2d at 55 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 149 L. Ed. 2d 968 (2001)). Left at these words, the Virginia Supreme Court's language in *Matthews* and *Bentley Funding Group* could indicate that judicial estoppel only applies when the non-moving party obtained a favorable judgment through its original assertions.

The Virginia Supreme Court followed its *Matthews* opinion with *Virginia Electric & Power Co.*, however, and deliberately clarified how to interpret this prerequisite. Virginia case law requires that "the court *relied upon* the prior inconsistent position in rendering a prior judgment or ruling." *Virginia Electric & Power Co.*, 278 Va. at 463, 683 S.E.2d at 528 (emphasis in original). The Virginia Supreme Court intentionally distinguished the proper interpretation of the "success" prerequisite as "relied upon" from the improper interpretation of the prerequisite as a "favorable judgment" upon the prior statement. *Id.* The Court concluded that "application of the doctrine requires only that the prior inconsistent factual position must have been relied upon by the court in reaching its decision." *Id.* at 465, 683 S.E.2d at 529.

## A. *Shore Bank's Prior Inconsistent Assertion Was a Factual Statement*

Shore Bank brought alternative legal theories in its Plea in Bar and its current argument. The initial Plea in Bar theory was that, as TARP fund recipients, they were legally prohibited from making any severance payment to Harvard. Shore Bank's current legal theory asserts that Shore Financial Corporation, not Shore Bank, was Harvard's employer because Shore Financial Corporation was the name listed on the W-2s. Judicial estoppel does not apply to the change in legal argument; it does apply to Shore Bank's factual assertion asserting its claim that TARP regulations applied to Shore Bank.

Judicial estoppel bars Shore Bank from asserting a position inconsistent with its prior factual assertion that Shore Bank is a TARP recipient. The Defendants' Plea in Bar asserted that TARP regulations barred HRB and Shore Bank from the contractual obligation to pay Harvard his severance because "both HRB and its wholly owned subsidiary, Shore Bank, are considered to be 'TARP recipients'." (Plea in Bar, ¶ 2.) TARP regulations only apply to Shore Bank's contract with Harvard if Shore Bank were a TARP fund recipient because it is "treated as the same employer" as HRB/Shore Financial Corporation, the direct funds recipient. 31 C.F.R. § 30.1 (2011) (defining "TARP recipient"). This Court did not rule that TARP regulations did not apply to Shore Bank. This Court determined that, because TARP regulation did apply to Shore Bank's contract with Harvard, the TARP regulations constituted an unlawful taking.

## B. *This Court Relied upon the Prior Inconsistent Position*

This Court relied on the factual assertion that HRB and Shore Bank are TARP recipients in order to determine that, in this particular instance, the TARP regulations targeted Harvard. In order to deny the Plea in Bar as to both Shore Bank and HRB, this Court found that HRB and Shore Bank were TARP recipients. This Court, then, relied upon the Defendants' own factual assertions offered in support of its legal argument. Shore Bank argued that it was a TARP recipient because of the TARP funds HRB received on December 31, 2008. Applying the Code of Federal Regulations definition of a "TARP recipient" to this claim, Shore Bank therefore factually asserted that Shore Bank "would be treated as the same employer as an entity receiving financial assistance based on the rules in sections 414(b) and 414(c) of the Internal Revenue Code (26 U.S.C. 414(b))." 31 C.F.R. § 30.1 (2011). That "entity" was HRB. HRB merged with Shore Financial Corporation. The merger closed in May 2008. Because HRB and Shore Financial Corporation merged prior to the receipt of the TARP funds Shore Bank originally invoked, Shore Bank's Plea in Bar required this Court to accept that Shore Bank was "the same employer" as Shore Financial Corporation.

Because of the particular nature of this Court's original ruling, the Defendant's current inconsistent assertion calls the integrity of the judicial process into question and implicates the purpose of judicial estoppel. The Plaintiff's argument against Shore Bank's Plea in Bar was that the TARP regulations constituted an unlawful taking. In ruling on the Plea in Bar hearing, this Court based its determination "whether a given regulation goes 'too far' for purposes of the *Fifth Amendment*" upon " an ad hoc, factual inquiry." *Cienega Gardens*, 331 F.3d 1319, 1337 (Fed. Cir. 2003); *Harvard v. Shore Bank*, 88 Va. Cir. 204 (2014). This Court found that the TARP regulations "targeted" Harvard's contract rights, as in *Cienega Gardens*. The inquiry required by *Cienega Gardens* means that the parties' factual assertions regarding the Employment Agreement at issue in the Plea in Bar were essential to the court's decision. To allow Shore Bank to take a

position inconsistent from the facts the Court's original inquiry relied upon would tend to disrupt the integrity of the judicial process.

Judicial estoppel bars the Defendants from arguing that Shore Financial Corporation and Shore Bank are entities too separate to be considered one employer in Harvard's Employment Agreement. Shore Bank made the inconsistent or contradictory prior factual assertion that Shore Bank and HRB, with whom Shore Financial Corporation merged, were treated as the same employer under TARP regulations.

## C. *Judgment*

The Defendants offered two defenses. First, they argued that TARP regulations prohibited them from paying Harvard's severance. Second, they argued that Shore Bank did not have to pay Harvard's severance or attorney's fees because Shore Bank was not Harvard's employer. The Court accepts neither argument. Harvard is entitled to the benefit for which he contracted: 2.99 times the average compensation paid to him by Shore Bank in the years 2005, 2006, and 2007, plus interest. The Court will award judgment for the Plaintiff in the sum of $655,495.43 with interest from May 20, 2014, the date the Plea in Bar was overruled.

## II. *Attorney's Fees*

Under the Employment Agreement between Shore Bank and Harvard, the Plaintiff is entitled to attorney's fees paid by the Defendants. According to the Agreement:

> Employer agrees to pay promptly as incurred, to the full extent permitted by law, all the legal fees and expenses which [Harvard] may reasonably incur as a result of any contest (regardless of the outcome thereof unless a court of competent jurisdiction determines that [Harvard] acted in bad faith in initiating the contest) brought by Employer, [Harvard], or others concerning the validity or enforceability of, or liability under, the Change in Control of Employer's Parent Company . . . provision of this Agreement or Amendments thereto, or any guarantee of performance thereof (including as a result of any contest by [Harvard] about the amount of any payment pursuant to the Change in Control provision or its Amendments), plus in each case interest on any delayed payment at the applicable Federal rate provided for in Code Section 7872(f)(2)(A); provided however, that the reasonableness of the fees and expenses must be determined by a court of competent jurisdiction.

(Employment Agreement, ¶ 11.) This Court determined that Shore Bank is estopped from claiming it is not the "Employer" referenced in the Agreement. Three "contests" emerged from the proceedings between the

Employer, Shore Bank, and Harvard. First, Plaintiff's suit for Declaratory Judgment against Shore Bank and HRB, filed May 22, 2012, in the Circuit Court of the City of Norfolk. (CL12003902-00.) Second, the federal action brought by Shore Bank against Harvard in the United States District Court for the Eastern District of Virginia, Norfolk Division, on June 14, 2012. (Civil Action No. 2:12-cv336.) The third action is this case, brought by Harvard against Shore Bank and HRB on June 6, 2013. The parties stipulated to the amount of reasonable legal fees and expenses for each action: $20,000 for the declaratory judgment; $12,500 for the federal case; and $142,500 through July 15, 2014, for the current breach of contract suit.

### A. *Defendants Are Not Responsible for Plaintiff's Legal Fees and Expenses from the Declaratory Judgment Action*

The Defendants argue against payment of attorney's fees on two grounds. First, they assert that specifically the declaratory judgment action did not properly concern the Change in Control provision as required by the Employment Agreement. Second, the Defendants claimed that Harvard should be denied attorney's fees for the current suit on bad faith grounds: he brought it despite knowing that Shore Bank was not his employer for purposes of the severance payment. The Court rejects the second argument. Shore Bank thought there were grounds to assert to the federal government and to this Court that it could be "treated as the same employer" as HRB. Harvard, therefore, had good faith grounds to believe he could prevail in a breach of contract claim against Shore Bank as his employer, and Harvard does prevail in the case *sub judice*. The Court accepts the first argument regarding the declaratory judgment action. Shore Bank is obligated to pay the legal fees and expenses Harvard incurred for the federal action and the current civil action, but not the fees for the May 22, 2012, declaratory judgment suit.

Harvard filed the declaratory judgment suit asking the court to declare that the Defendants must pay Harvard's legal fees and costs as incurred if he filed a contest seeking payments related to a breach of contract of the Change in Control provision. In his Amended Complaint, Harvard requested that the court award him reasonable legal fees and expenses incurred in the declaratory judgment action. The court sustained the Defendants' Demurrer, and Harvard again raises his request for payment of legal fees for that action. The Defendants correctly argue that the action did not concern the "validity or enforceability of, or liability" of the Change in Control provision. (Employment Agreement, ¶ 11.)

The issue raised in the declaratory judgment action did not concern the Change in Control provision as required for the Defendants to be responsible for Harvard's attorney's fees. Under the Employment Agreement, the Defendants would pay the attorney's fees "concerning the validity or enforceability of, or liability under, the Change in Control"

provision, or "any guarantee of performance thereof (including as a result of any contest by [Harvard] about the amount of any payment pursuant to the Change in Control provision." (Employment Agreement, ¶ 11.) The declaratory judgment issue, however, concerned the legal fees provision of the Employment Agreement. Although attorney's fees are an inherent aspect of bringing a breach of contract action, the payment of legal fees is not the same issue as the Change in Control provision or a suit concerning the provision's validity, enforceability, or the Defendants' liability. Seeking confirmation that attorney's fees would be paid if a breach of contract suit was brought is not the same as bringing the breach of contract suit and the basis of such suit. The issues presented in the declaratory judgment action could have litigated in either the federal suit or the current breach of contract claim, for each of which the Defendants are required to pay Harvard's reasonable legal fees and expenses.

## B. *Plaintiff's Reasonable Legal Fees and Expenses*

As stipulated by the parties, Harvard is entitled to $12,500 in legal fees and expenses from the federal action, and $142,500 through July 15, 2014, for the current action. The Court does not preclude Harvard from seeking reasonable legal fees and expenses he incurred after July 15, 2014.